Filed 6/6/16  Albright v. DarbeeVision,Inc. CA4/3

NOT BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RUSSELL ALBRIGHT et al., | |
| Plaintiffs and Appellants, | G051079 |
| v. | (Super. Ct. No. 30-2012-00586110) |
| DARBEEVISION, INC., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Geoffrey T. Glass, Judge. Affirmed.

Law Offices of Benjamin G. Ramm and Benjamin G. Ramm for Plaintiffs and Appellants.

Werner Law Firm and Lee G. Werner for Defendants and Respondents.

\*          \*          \*

Plaintiffs' Russell Albright and R.E. Albright, LLC (REA) (collectively, plaintiffs) first amended complaint against Defendants DarbeeVision, Inc. (DVI), Paul Darbee, Larry Pace, and William Heatley (collectively, defendants) alleged Albright entered into a stock purchase agreement with DVI. The complaint alleged eight causes of action. The fifth cause of action for an injunction was the only cause of action against Pace and Heatley. The remaining causes of action for specific performance, conversion, injunctions, declaratory relief, intentional misrepresentation, fraud and deceit, were alleged against DVI and Darbee or Darbee alone. After a court trial, the superior court found in favor of defendants. The court found there was no consideration for the stock purchase agreement and no meeting of the minds between the parties, as evidenced by Albright's refusal to sign DVI's Corporations Code section 25102, subdivision (f),[1] acknowledgement or a noncompetition agreement, which DVI made a condition to the issuance of stock. Plaintiffs contend the judgment should be reversed because the stock purchase agreement signed by Albright was a contract. We agree there was no consideration for the stock purchase agreement. (*Passante v. McWilliam* (1997) 53 Cal.App.4th 1240, 1247 [promise to issue stock to plaintiff for prior efforts lacked consideration].) We therefore affirm.

I

FACTS

The following facts are sufficient for the issue presented on appeal, i.e., whether the stock purchase agreement was an enforceable contract. In August 2005, REA entered into an option agreement with Darbee to purchase DarbeeVision Technology. DarbeeVision is a process whereby a picture's clarity and depth are enhanced. The process was used on the movie *Gosford Park*. In that application, the

---

[1] All undesignated statutory references are to the Corporations Code.

2

film was turned into a digital format, DarbeeVision Technology was applied and the digital version was turned back into film. To do so, however, was a lengthy and expensive process. Because it could not run in real time—i.e., having the appearance of happening instantaneously with filming—it was not suitable for a large portion of the marketplace.

The option agreement gave REA a six-month option to purchase DarbeeVision Technology for $2 million. Albright signed the option agreement on behalf of REA. The option period was extended for 18 months in April 2006, and another 18-month option period commencing in April 2008. The option period ended in May 2009, without REA exercising the option.

During the period of time REA held the option, it attempted to develop and market DarbeeVision Technology. In September 2005, REA hired Pace as an independent sales representative to attempt to find a buyer for the Technology. Pace signed a confidentiality and noncircumvent agreement with REA. Contact was made with people in the movie industry. Meetings were held with people from a number of companies, including Skywalker Productions, Google, Adobe, Dreamworks, Samsung, and Apple.

REA also hired Heatley, a computer science major at Chapman University to attempt to have DarbeeVision Technology work on a real-time platform. Heatley also signed a confidentiality and noncircumvent agreement with REA. During the option period, Heatley worked on the development of a real-time chip for the product. He kept Albright and Pace "up to date with regard to his work on the DarbeeVision Technology." By February 3, 2009, Heatley developed a process that permitted DarbeeVision to run in real time, although it still needed modification to permit "chroma tracking" and "clipping." Nine days later, the chroma tracking issue was resolved and Heatley began working on the clipping issue. The working relationship between REA and Heatley ended in the middle of March 2009.

3

In May 2009, Albright sent letters to Pace and Heatley, asking them to return to REA "all materials created, developed, or used in the process of creating software related to" the venture. The materials were not returned because Darbee, Albright, and Pace were in the process of forming a new corporation. It was anticipated that Darbee would receive 50 percent of the founders stock, and Pace and Albright would each receive 25 percent of the founders stock. On August 3, 2009, Albright signed a document entitled Stock Purchase Agreement at a meeting he had with Darbee, Pace, and Heatley. His was the only signature on the document. According to the document, Albright agreed to purchase 500,000 founder's shares of stock in DVI. The purchase price for the shares was: "The substantial time and capital contributions *made* by . . . Albright to promote and benefit DarbeeVision. *This shall constitute the entire investment* by . . . Albright to purchase the Founder's Common Stock of [DVI]." (Italics added.) As Albright understood it, he would receive the stock for his prior efforts. The purchase agreement further stated: "This Agreement constitutes the sole understanding of parties with respect to the subject matter of the Agreement."

The DVI corporate book and three signed stock certificates were present at the meeting. The stock certificates were made out to Darbee for 1 million shares, Pace for 500,000 shares, and Albright for 500,000 shares. Although Albright had already signed the stock purchase agreement, he took the corporate book and the other documents to his office, to have his nonattorney advisor, Frank Zagar, look at them. Zagar had drafted each of the option agreements REA had with Darbee.

After Albright signed the stock purchase agreement, he gave Pace the Dell computer Albright bought in 2008, for DarbeeVision business. Adobe Photoshop, other programs, and all the documentation, faxes, e-mails, and customer databases REA generated relating to DarbeeVision Technology were on the computer.

On August 12, 2009, Darbee, Pace, and Albright signed the certificate of

4

organization as the incorporators of DVI. All three became directors of the corporation. Darbee became the president and Pace became the secretary and treasurer. A week later, Albright sent an e-mail suggesting certain changes to the bylaws and one modification to the stock purchase agreement.

Albright was provided with a document entitled "Certificate of Representations of Purchaser with Respect to Securities to be Issued under Exemption from Qualification provided by . . . Section 25102[, subdivision] (f)" in September 2009. (Original capitalization omitted.) The certificate stated the shares in DVI have not been registered under the Securities Act of 1933, have been acquired for investment purposes only, and may not generally be sold or otherwise transferred without an exemption to the act. In September 2009, Albright complained the "[s]ales [c]ontract" prohibits him from selling his shares "regardless of the Securities Acts of California," and that he wanted the contract language changed. He also complained that indemnification was limited to the period of time the individual is a director in the corporation, and he thought indemnification "should go on indefinitely."

Albright discussed with Zagar about the certificate sent to him by DVI. He was concerned that it restricted his ability to sell the stock and that the certificate contained language not found in section 25102, subdivision (f). Albright never signed the certificate.

In September 2009, Albright received a letter from DVI advising him that shares in the corporation could not be issued to him until he signed the certificate recognizing the Corporations Code restriction on the sale or transfer of the stock. On September 18, 2009, DVI's corporate counsel, Bertrand Cottle, wrote to Albright stating that Darbee and Pace have learned that Albright had been "blind copying internal corporate communications, as well as attorney-client communications, to third parties," and that it was necessary for him to sign and return a nondisclosure agreement. Nearly a

5

month later, Albright wrote to Cottle stating, among other things: that the stock purchase agreement stated nothing about his having to sign a certificate of purchaser, signing a nondisclosure agreement, or signing a noncompetition agreement; that he would no longer act as a director in DVI; and that he considered the stock purchase agreement binding. Albright also stated the decision not to participate as a director was made as a result of Zagar's advice. Albright also requested that he be provided with his DVI "'Founders' Stock Certificates."

Cottle wrote to Albright two days later, informing him DVI accepted his decision not to serve as a director and that the shares of stock would be issued to him, but only after he signed the section 25102, subdivision (f) statement as Darbee and Pace had done. Albright did not sign the section 25102, subdivision (f) advisement, and in the middle of December 2009, Cottle again wrote to Albright. The letter stated that Albright's refusal to sign the advisement could only be interpreted as evidencing his intent not to participate as a shareholder in DVI. The letter informed Albright that if he did not sign and return the advisement within 15 days, the offer to issue him stock in DVI would be withdrawn.

Albright did not sign and return the advisement. On Janaury18, 2010, more than a month after the letter was sent setting forth the 15-day time limit, Albright e-mailed Cottle that he had concerns he wanted addressed by DVI before he would sign. Three days later, Cottle responded by letter, notifying Albright "the offer of shareholder participation remains withdrawn." Shortly thereafter, the Dell computer Albright had provided DVI was returned, everything on the computer having to do with the work REA did while he held the option to purchase the DarbeeVision Technology had been removed.

## II

## DISCUSSION

Before delving into the matter of whether Albright had an enforceable contract with DVI, we note appellants' brief does not claim REA was harmed in any way by the complained of actions in this matter. As to REA, we find no error below and affirm the judgment. The only issue addressed in the appellant's opening brief was whether the stock purchase agreement was an enforceable contract.

"Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed. But if the material facts are certain or undisputed, the existence of a contract is a question for the court to decide. [Citation.]" (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.)

The stock purchase agreement set forth Albright's consideration for the purchase of the stock: "The substantial time and capital contributions made by . . . Albright to promote and benefit DarbeeVision. This shall constitute the entire investment by . . . Albright to purchase the Founder's Common Stock of [DVI]." The last provision of the stock purchase agreement stated the "Agreement constitutes the sole understanding of parties with respect to the subject matter of the Agreement." Albright admitted that as he understood it, he was to receive the stock for his prior efforts.

For a contract to be valid and enforceable, the parties must be capable of contracting, the contract must have a lawful object, the parties must consent to the contract, and there must be consideration provided by each party. (Civ. Code, § 1550.) Consideration is sufficient to support the contract if it consists of "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor . . . ." (Civ. Code, § 1605.)

7

"'A contract is . . . an exchange of promises.' [Citation.]" (*Orcilla v. Big Sur, Inc.* (2016) 244 Cal.App.4th 982, 1005.) In the present case, DVI promised to give Albright 500,000 shares of stock. Albright's counsel argued Albright's consideration for the stock consisted of the substantial time and capital contributions he previously made to promote and benefit DarbeeVision, as was stated in the stock purchase agreement. Counsel conceded he could not assert Albright's time and capital contributions were made in anticipation of Albright receiving stock for in exchange for them. He was correct. The purchase price for the promise of stock was Albright's *past* investment of time and capital contributions made when his limited liability corporation, REA, held an option to purchase DarbeeVision Technology.

The trial court found Albright's actions prior to the stock purchase agreement provided no consideration for a sale of stock. The court was correct. What Albright purported to exchange for the stock had already been performed. Consequently, DVI received no bargained for consideration in exchange for its promise of stock. "Past consideration cannot support a contract. [Citation.]" (*Passante v. McWilliam*, 53 Cal.App.4th at p. 1247 [promise to issue stock to plaintiff for prior efforts lacked consideration].)

In *Passante v. McWilliam*, *supra*, 53 Cal.App.4th at page 1242, an opinion penned by the late Justice Sills, the plaintiff obtained funding for the Upper Deck Company, "a rookie baseball card company." The company desperately needed $100,000 to purchase the paper product necessary to produce its baseball cards. The company's attorney arranged the funding by having his partner's brother lend the company the money. (*Ibid.*) After he had done so, the directors were so grateful they agreed to give the attorney 3 percent of the company's stock. The board later reneged on their promise and the attorney sued. (*Ibid.*) Another panel of this court found the attorney had not provided bargained for consideration in exchange for the issuance of

8

stock (*id.* at pp. 1247-1248), characterizing the promise to issue the stock as an "inchoate gift of stock" (*id.* at p. 1242).[2] *Passante v. McWilliam* is directly on point: the stock purchase agreement in this matter was not supported by any consideration on Albright's part.

Albright's counsel also argued to the trial court that Albright "turned over" to DVI the $10,000 Dell computer that had on its hard drive all the client contacts and work that had been done on DarbyVision while REA held the option to buy DarbeeVision Technology, including all of Pace's work product. While it is true Albright gave the computer to DVI[3] and provided DVI with two Web sites, the stock purchase agreement says nothing about Albright having any obligation to furnish those items to DVI, and as Albright's counsel repeatedly urged, the stock purchase agreement stated that it was the *complete* agreement between the parties. Albright's unbargained for action performed after he signed the stock purchase agreement cannot supply the missing consideration.

The trial court also found an alternative basis for finding in favor of defendants. However, because we found the purchase stock agreement lacked consideration on Albright's part and is unenforceable, there is no need to review further findings by the trial court.

---

[2] Albright has not proceeded on a theory that the stock was a gift for his past acts and that the stock was actually or symbolically delivered. (See *Passante v. McWilliam*, *supra*, 53 Cal.App.4th at p. 1249, fn. 7.)

[3] The computer was returned to Albright when he refused to sign the confidentiality agreement and the Corporations Code notice regarding the nature of the unregistered stock.

III

DISPOSITION

The judgment is affirmed.  Defendants are entitled to their costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.